**SAFE DEPOSIT BANK AND TRUST COMPANY, Petitioner, Appellant,**

v.

**Eugene B. BERMAN, Trustee, Appellee. In the Matter of FERNANDES WELDING & EQUIPMENT SERVICE, INC., Bankrupt.**

**No. 7041.**

United States Court of Appeals First Circuit.

April 22, 1968.

George B. Scully, Holyoke, Mass., with whom Lyon, Curley, Scully & Fitzpatrick, Holyoke, Mass., was on brief, for appellant.

Earl Alpert, Springfield, Mass., for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Appellant Safe Deposit Bank and Trust Company (Bank) appeals from an order of the district court affirming an adverse finding of a referee in bankruptcy. The referee had ruled that the

Bank had not succeeded in establishing a lien on certain property (or the sales proceeds thereof) of a bankrupt.

The Bank had financed the bankrupt during the period relevant to this case, using a variety of security arrangements. On June 26, 1963 it had executed a blanket "Loan and Security Agreement". This Agreement provided that the Bank would loan up to 70 per cent of the "borrowing base", and would be secured for its advances by the borrower's "contract rights, accounts receivable and other collateral and in the proceeds and products thereof." The Agreement encompassed liabilities of the borrower to the Bank "due or to become due, now existing or hereafter arising".

On July 30, 1963 the debtor borrowed $25,000 on a demand note from the Bank, which contained the following printed recitation:

" * * * having deposited with said bank, as collateral for payment of this and any and all other liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, * * * the following property, viz:"

This was followed by the typewritten notation:

"Security Interest in Accounts Receivable,

Contract Rights, etc. under agreement dated 6/26/53; also in Equipment, etc. under Security Agreements dated 5/6/63 and 7/30/63."

The security agreement of July 30, 1963 was executed on a printed form containing the following condition: " * * * to secure payment of the Total Debt as evidenced hereby and by the note or notes of even date herewith and also any and all liabilities of Debtor to Secured Party under this agreement or said note or notes or any renewals or·extensions thereof * * *." The

appropriate financing statements required by the Uniform Commercial Code were duly recorded.

Subsequent borrowings were accomplished through notes bearing the same notations as to security as the note of July 30, 1963.* While this note was marked as paid on September 18, 1963, the balance owed the Bank by the debtor was never below $25,000 and, as of September 18, was $109,876.50.

The debtor being declared a bankrupt, the Bank sought to enforce a lien against the property covered by the July 30 security agreement. The trustee claimed that, the note having been paid, the mortgage expired. The Bank claims that the security agreement secured notes subsequent to that of July 30 or, alternatively, that the subsequent notes were themselves security agreements.

The problem is created by a security agreement which is confined by its terms to the specific note it secures—or any renewals or extensions thereof—and the contemporaneous and subsequent notes which recite that the agreement had been deposited as collateral for all present and future liabilities.

We reluctantly affirm—reluctantly because the result is commanded not by fireside equities but by the necessary technicalities inherent in any law governing commercial transactions. We start with the proposition that the Uniform Commercial Code, Mass.Gen.Laws Ann. ch. 106, § 9–201 (1958), provides that "Except as otherwise provided by this chapter a security agreement is effective according to its terms * * *." We next come to section 9–204(5) which states that "Obligations covered by a security agreement may include future advances * * *." Official Comment 8 under this section contains the following language: "Under subsection (5) collateral may secure future as well as present advances when the security

---

* The subsequent notes differed only in dropping a reference to a security agreement dated May 6, 1963. This agreement, apparently deemed not relevant by both parties, does not appear in the record before us.

agreement so provides. \* \* \* In line with the policy of this Article toward after-acquired property interests this subsection validates the future advance interest, provided only that the obligation be covered by the security agreement." See also In re Rivet, 4 CCH Instal. Credit Guide ¶ 97858 (E.D.Mich., Oct. 2, 1967) (Referee's opinion); P. Coogan, W. Hogan, D. Vagts, 1 Secured Transactions Under the Uniform Commercial Code § 3.07(4) (1967); O. Spivak, Secured Transactions 25, 31 (1963).

■ The definition of security agreement in section 9–105(h) is "an agreement which creates or provides for a security interest". The security agreement of July 30, 1963 was such an agreement. A note, even reciting data relating to collateral security, is not thereby converted into such an agreement. Harding v. Eldridge, 186 Mass. 39, 71 N.E. 115 (1904). Moreover, although appellant urges that the note and security agreement be read together, section 3–119 of the Uniform Commercial Code states only that "the terms of an instrument [i. e., a negotiable instrument, § 3–102] may be modified or affected by any other written agreement executed as a part of the same transaction \* \*." It does not say that the terms of the negotiable instrument can affect a separate written agreement.

We acknowledge that Comment 3 under section 3–119 explains that "The section applies to negotiable instruments the ordinary rule that writings executed as a part of the same transaction are to be read together as a single agreement." But even were we to say that the terms of a note could modify the terms of a separate, if contemporaneous, security agreement, we face the fact that the supposedly curative language in the note regarding future liabilities is not phrased as an undertaking but as a statement of something done in the past which was not, in fact, done. The note merely recites " \* \* \* having deposited \* \* \* as collateral for payment of \* \* \* liabilities \* \* \* now existing or hereafter arising \* \* \*." The security agreement itself is silent as to its collateral status relative to future obligations other than renewals or extensions of the specific note.

It is arguable that the debtor's failure to demand, pursuant to section 9–404(1) and (2), a termination statement indicating that appellee had no security interest is evidence of its alleged understanding that the July 30, 1963 security agreement was indeed intended to cover future advances. This, together with the notations on the various notes, raises the question of the extent to which the intention of the parties and equitable considerations may affect rights ineffectively preserved in legal instruments.

Massachusetts law has shown itself sensitive to such considerations, for example, in refusing to treat as discharged a real estate mortgage of record, when the intention of the parties was to continue a prior security for a new note, Piea Realty Co. v. Papuzynski, 342 Mass. 240, 172 N.E.2d 841 (1961), and in reinstating a first mortgage on real estate which had been discharged by mistake, North Easton Co-operative Bank v. MacLean, 300 Mass. 285, 15 N.E.2d 241 (1938). But in this case we deal with the Uniform Commercial Code and must look to its terms and spirit for guidance.

Section 1–103 at first analysis would seem to give comfort to appellant in recognizing that "principles of law and equity" should supplement the provisions of the Code "[u]nless displaced by the particular provisions of this chapter \* \* \*." The question whether section 9–204(5), regarding the coverage of future advances by a security agreement, is such a provision is made more difficult by the Massachusetts Code Comment to section 1–103. This Comment states:

> "The provision, however, is not as broad as would first appear. It must be read in the light of the five purposes and policies which, under § 1–102, the interpretation of the Code must promote."

These purposes and policies are "to simplify, clarify and modernize the law * * * to permit the continued expansion of commercial practices * * * [and] to make uniform the law among the various jurisdictions." Mass.Gen. Laws Ann. ch. 106, § 1–102 (1958).

To the extent that the legal significance of documents may be varied and enlarged by other documents evidencing an understanding of the immediate parties to a transaction, we suspect that the law of commercial transactions will not achieve the stated purposes. The basis of the trouble here is that appellee used an inappropriate form to do what it apparently wished. It not only chose to prop up its inadequate security agreement with a narrative recitation on a note of the same date but persisted on at least four other occasions in doing the same thing.

In a commercial world dependent upon the necessity to rely upon documents meaning what they say, the explicit recitals on forms, without requiring for their correct interpretation other documents not referred to, would seem to be a dominant consideration. If security agreements which on their face served as collateral for specific loans could be converted into open-ended security arrangements for future liabilities by recitals in subsequent notes, much needless uncertainty would be introduced into modern commercial law. In effect, notes would take on the character of security agreements.

Certainly such equities as appellant can claim here would be unavailing as against an innocent third party who had extended credit on the basis of the assumption that the July 30, 1963 security agreement was no longer effective after payment of the note it purported to secure. But appellee, the trustee in bankruptcy, stands precisely in the position of a lien creditor without knowledge of a security interest before it is perfected under section 9–301 of the Code.

Affirmed.