**F.S. CREDIT
CORPORATION, Appellee,**

v.

**SHEAR ELEVATOR, INC., and
DeWayne Shear, Appellants.**

No. 84–28.

Supreme Court of Iowa.

Nov. 13, 1985.

John T. McCoy of Lindeman & Yagla, Waterloo, for appellee.

Stephen P. Carroll of Hobson, Cady & Drew, Hampton, for appellants.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McCORMICK, SCHULTZ, and WOLLE, JJ.

REYNOLDSON, Chief Justice.

In this opinion we review a court of appeals decision involving the sale and alleged conversion of farm crops securing an extension of credit under Article Nine of the Uniform Commercial Code. Defendants Shear Elevator, Inc., and DeWayne Shear (hereafter "Shear") appealed from a district court money judgment in favor of the secured party, F.S. Credit Corporation (F.S. Credit). We vacate the court of appeals decision in part, modify the district court judgment, and remand the case to district court.

In 1977 farmer Kenneth Kettwig and his wife Karen purchased farm supplies from a cooperative, Butler-Grundy Farm Service Company (BGFS), of Allison, Iowa. Credit was arranged through F.S. Credit of Bloomington, Illinois, a lender company servicing a family of cooperatives in which BGFS was a member. Under this credit arrangement Kettwig and his wife executed an agri-finance credit application, a security agreement, and a financing statement. The application was approved by F.S. Credit and the financing statement was filed with the Iowa Secretary of State on March 3, 1977.

The security agreement covered "[a]ll crops now growing and all such crops to be planted or otherwise become growing crops, either before or after harvest" on three rented farms described in the instrument. It further provided:

> 2. DEBT. This security interest is given to secure the performance of the covenants and agreements herein set

forth and for payment of an indebtedness in the face amount of *$20,000.00* as evidence by a promissory note(s) or other instrument(s) executed by Debtor payable to the order of said Secured Party as therein provided, and with interest as therein set forth.

. . . .

6. OBLIGATIONS SECURED ...: This security instrument is given to secure the performance of the covenants and agreements herein set forth and the payments of the indebtedness evidenced by this Agreement and any indebtedness of Debtor to Secured Party, whether now existing or hereafter incurred, of every kind and character, direct or indirect, and whether such indebtedness is from time to time reduced and thereafter increased or entirely extinguished and thereafter reincurred....

. . . .

16. DISPOSAL OF COLLATERAL: Debtor shall not sell, assign, encumber or transfer the collateral or any part thereof without the prior written consent of the Secured Party. No waiver of this provision shall be effective unless in writing and signed by the Secured Party.

Each month BGFS would send Kettwig a statement of the purchases made during the prior month, and a promissory note made payable to BGFS, for assignment to F.S. Credit, in the same amount. Kettwig had the option of paying the amount due, or signing and returning the note. He or his wife signed and returned the note in each instance.[1]

In July 1977 Kettwig requested further credit, having exhausted the $20,000 line of credit first extended. July 21, 1977, F.S. Credit confirmed by letter that an additional $5000 in credit would be honored. By September 20, 1977, Kettwigs had signed and delivered notes totaling $25,000.

In violation of the security agreement, Kettwig sold his 1977 crops to Shear without the permission or knowledge of F.S. Credit. Shear paid one-half of the proceeds to the landlords and the other half to Kettwig on the following dates in the designated amounts:

| | |
|---|---|
| October 11, 1977 .........$ | 749.77 |
| October 14, 1977 .......... | 5,405.14 |
| October 17, 1977 .......... | 6,684.48 |
| October 19, 1977 .......... | 3,871.03 |
| October 29, 1977 .......... | 1,933.19 |
| November 25, 1977 ....... | 3,391.70 |
| November 30, 1977 ....... | 3,349.80 |
| January 9, 1978........... | 1,572.03 |
| TOTAL | $ 26,957.14 |

December 31, 1977, the Kettwigs' promissory notes held by F.S. Credit came due. Kettwig was unable to pay. F.S. Credit traced the crops and on December 13, 1979, instituted the action in conversion against Shear.

Meanwhile, on January 15, 1979, Iowa State Bank of Clarksville filed a Butler County action against the Kettwigs, their landlords, BGFS, F.S. Credit and Shear, claiming an interest in the 1978 crops and asking for a declaration of the priorities of the parties and other equitable relief. In that case F.S. Credit claimed a priority interest in the 1978 crops, based upon the 1977 promissory notes and the language of the 1977 security agreement. Ultimately the litigation was settled out of court, with F.S. Credit and BGFS jointly receiving $7432 from the 1978 crop proceeds. As a result of negotiations between these two and payment of advanced costs to an attorney, BGFS received $6431.31 and F.S. Credit received $902.16. F.S. Credit also received $750 in settlement of an unrelated claim against a different elevator for purchasing grain in which it claimed a security interest.

This action against Shear was tried to the court on September 19 and 20, 1983. The district court held the Kettwigs signed the promissory notes, they received $25,000

---

1. At trial Shear defended on the ground certain of these notes were not signed by either Kettwig or his wife. Trial court found to the contrary, and Shear challenged this finding on appeal.

The court of appeals determined there was substantial evidence to support trial court's finding that each note was signed by one of the Kettwigs. We agree with the court of appeals.

in value from BGFS under the credit arrangement, and Kettwig violated the security agreement when he sold the collateral without the permission of F.S. Credit.[2] The court found no course of dealing between the parties nor usage of trade that would modify the requirement that Kettwig obtain written permission to sell the collateral.

Trial court found Shear never inquired whether the crops secured a debt, nor did he check the office of the secretary of state for a financing statement covering Kettwig's crops.[3] It determined F.S. Credit was secured to the extent of $25,000 even though the security agreement was never formally amended. The court, however, reduced the judgment, entered against Shear for the conversion, by the amounts of $750 and $902.16 received in the prior settlements. Legal interest was allowed from January 1, 1978, the first day the notes were overdue, until December 13, 1979, the date F.S. Credit filed this action. Thereafter, the judgment provided for interest at ten percent per annum.

Defendant Shear timely appealed. F.S. Credit cross-appealed from the "computation of the judgment and judgment interest." We transferred the case to the court of appeals.

The court of appeals held against Shear's contentions, except that it determined F.S. Credit was secured only to the extent of $20,000. Further, the appeals court held the judgment should be reduced by the total settlement of $7432 jointly obtained by F.S. Credit and BGFS, rather than the $902.16 F.S. Credit actually received. Finally, the court of appeals ruled that the district court's computation of interest was correct.

We granted F.S. Credit's application for further review, which raises three issues: Did the court of appeals err (1) in limiting F.S. Credit's security interest to $20,000; (2) in reducing F.S. Credit's judgment by $7432; and (3) in affirming trial court's limitation of presuit interest to the legal rate then prevailing?

I. *Should F.S. Credit's security interest be limited to $20,000?*

Shear argues on appeal that trial court erred in holding F.S. Credit was secured to the extent of $25,000. The security agreement, it asserts, purported to secure an indebtedness only in the amount of $20,000. It was not amended, and the notes could not enlarge the scope of the debts for which the agreement provided security. The court of appeals agreed, holding the oral agreement to extend the additional $5000 in credit, "absent a signed modification to the security agreement," was inadequate to create the additional secured interest in the crop collateral. The court reasoned that if it were "to allow the secured interest to include the $5000, [it] would introduce an element of uncertainty to commercial law that the Uniform Commercial Code was designed to eliminate," citing *Safe Deposit Bank & Trust Co. v. Berman,* 393 F.2d 401, 404 (1st Cir.1968). F.S. Credit responds by contending it was secured to the full $25,000 and interest because the security agreement was orally modified in July 1977, when the additional credit was extended.

Iowa Code section 554.9203 [4] sets out the minimum requirements for a valid security agreement.[5] Shear does not dispute the

2. Karen Kettwig separated from Kenneth Kettwig on August 12, 1977, before the crops were sold. Their marriage was dissolved January 12, 1979.

3. Obligations of the buyer, secured party, and debtor now have been modified by the 71st General Assembly, 1985 regular session. *See* 5 1985 Iowa Acts ch. 188.

4. All references in this opinion are to the 1975 Code unless another Code is specified.

5. Iowa Code subsections 554.9203(1) and (2) provide:

> 1. ... [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless
> a. the collateral is in the possession of the secured party pursuant to agreement, or the *debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers*

description of the collateral, the description of the land, that value had been given by F.S. Credit,[6] or that the Kettwigs had rights in the collateral.

 The "basics" of a security agreement are (1) a writing manifesting an intent to create or provide for a security interest, (2) signed by the debtor, and (3) containing a description of the collateral, further identified, if crops or timber, by describing the land concerned. *See In re Bollinger Corp.*, 614 F.2d 924, 926 (3d Cir. 1980); *Morey Machinery Co. v. Great Western Industrial Machinery Co.*, 507 F.2d 987, 990 (5th Cir.1975); *In re Numeric Corp.*, 485 F.2d 1328, 1331 (1st Cir.1973); *Crete State Bank v. Lauhoff Grain Co.*, 195 Neb. 605, 608, 239 N.W.2d 789, 791 (1976). There is no requirement that the amount secured or a maturity date be shown: those are essential contents of the underlying debt instrument. *See In re Cooley*, 624 F.2d 55, 57 (6th Cir.1980).

 Because identification of the consideration is not a "basic" of the security agreement, a modification in that regard need not be in writing, but may be effected orally.

> [I]t should follow that a modification of any of the agreement's basic terms, such as a change in the description of the collateral, must also meet the basic requirements of a signed writing.... On the other hand, terms other than basic "required" terms might well be modified by a subsequent oral agreement under the general law of contracts.

69 Am.Jur.2d *Secured Transactions* § 309, at 144 (1973) (footnotes omitted).

Iowa Code section 554.1103 provides that "[u]nless displaced by the particular provisions of this chapter, the principles of law and equity ... supplement its provisions."

The Uniform Commercial Code does not specifically treat the subject of modification of a security agreement. Thus we may follow Iowa contract law, which permits oral modification of a written contract if adequate consideration is provided. *See Recker v. Gustafson*, 279 N.W.2d 744, 759 (Iowa 1979); *DeWaay v. Muhr*, 160 N.W.2d 454, 456 (Iowa 1968).

 In this case substantial evidence supported trial court's finding that the agreement had been orally modified to expand the security interest to $25,000. Kettwigs requested the additional $5000 credit. They were notified of the additional extension by letter from F.S. Credit, which subsequently advanced the additional funds. In these circumstances the modified security agreement was valid and enforceable as between the parties to it. *See Restatement (Second) of Contracts* § 89 (1981). There is no apparent reason why it should not bind Shear. Shear did not even check the filed financial statement and surely was not misled by the written security agreement. *See* J. White & R. Summers, *Uniform Commercial Code* § 23–3, at 904 (2d ed. 1980) ("Generally, only a third-party who can prove that he *in fact* relied on misleading documents in concluding that no competing claim exists should succeed against the secured creditor with estoppel arguments under 1–103. We suspect that it will be rare indeed when a third party has so much as looked at much less been misled by another's security agreement.").

The reliance of Shear and the court of appeals on *Berman*, 393 F.2d 401, is misplaced. The security agreement in *Berman* was limited specifically to securing a debt evidenced by a promissory note executed on the same date. No provisions

---

crops growing or to be grown or timber to be cut, a *description of the land concerned;* and
 b. *value has been given;* and
 c. the *debtor has rights in the collateral.*
 2. A *security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection*

*1 have taken place* unless explicit agreement postpones the time of attaching.
(Emphasis added.)

6. Value is defined in part as a "binding commitment to extend credit or for the extension of immediately available credit whether or not drawn on." Iowa Code § 554.1201(44)(a) (1975).

were made for future advances. *Id.* at 402–03; *see In re Cantrill Construction Co.,* 418 F.2d 705, 708 (6th Cir.1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970); 4 R. Anderson, *Uniform Commercial Code* § 9–203:9, at 161 (2d ed. 1971) ("Where the security agreement refers to a particular debt which is secured thereby, the security agreement does not cover subsequent loans...."). In *Berman* the referenced note, executed with the security · agreement, was paid. Subsequent notes were claimed to be secured by the collateral described in the agreement.

In the case before us future advances were covered by a specific provision of the security agreement: "[A]ny indebtedness of Debtor to Secured Party, whether now existing or hereafter incurred, of every kind and character, direct or indirect...." None of Kettwigs' indebtedness was paid. *Berman* has no application in the circumstances presented here.

We hold the court of appeals erred in holding F.S. Credit was secured only to the extent of $20,000 and not $25,000 with accrued interest, and in so modifying the district court judgment.

II. *Should F.S. Credit's judgment be reduced by $7432?*

The court of appeals adopted Shear's rationale that it should have credit for the full amount that BGFS and F.S. Credit received in settlement of the Clarksville Bank lawsuit involving Kettwig's crops grown in a subsequent year. The court noted F.S. Credit's claim in that case was predicated upon its same 1977 security agreement, and the final court order, made pursuant to the parties' stipulation, disbursed one-half of certain 1978 crop proceeds ($7432) to BGFS and F.S. Credit. The appeals court then concluded F.S. Credit had "already collected $7,432 based on the 1977 agreement," and what it then chose to do with that sum was of no concern to the court, other than to hold F.S. Credit's judgment must be reduced by the full $7432.

F.S. Credit does not dispute that its claim in the unrelated case was based on the same 1977 security interest, or that the structuring of the settlement distribution between BGFS and F.S. Credit purposely was arranged to satisfy Kettwig's 1977–78 open account with BGFS. F.S. Credit contends, however, that BGFS maintained a legitimate claim in the unrelated case, and there is no obligation under Iowa law for a tort victim to exhaust other means of recovery before pursuing a particular tortfeasor. Thus it argues any sum received by F.S. Credit out of the 1978 crops was of gratuitous benefit to Shear. F.S. Credit further asserts any amount it received merely reduced the amount of its damages and is not a setoff as Shear had no claim against it; there was no legal obligation for BGFS and F.S. Credit to divide the settlement to benefit Shear and the latter did not meet its burden to prove that F.S. Credit waived any part of its tort claim against Shear.

 This action is at law, therefore, our review is on errors of law. *Hubby v. State,* 331 N.W.2d 690, 694 (Iowa 1983); *R.E.T. Corp. v. Frank Paxton Co.,* 329 N.W.2d 416, 418–19 (Iowa 1983). If the facts found by the court in a law action are supported by substantial evidence and justified as a matter of law, they are binding on the appellate court. *Gere v. Council Bluffs Community School District,* 334 N.W.2d 307, 309 (Iowa 1983); *see also* Iowa R.App.P. 14(f)(1). In evaluating the sufficiency of the evidence, we view it in the light most favorable to sustaining the trial court's judgment, and need only consider evidence favorable to the judgment, whether or not it is contradicted. *Briggs Transportation Co. v. Starr Sales Co.,* 262 N.W.2d 805, 808 (Iowa 1978); *Packwood Elevator Co. v. Heisdorffer,* 260 N.W.2d 543, 544 (Iowa 1977). Independent claims not addressed in the findings but inconsistent with the judgment are considered to have been decided adversely to the losing party; review merely is to determine whether the evidence is adequate to support the findings that trial court is thus

deemed to have made. *Bahnsen v. Rabe,* 276 N.W.2d 413, 414 (Iowa 1979).

Here trial court must have determined the proof offered by Shear justified a credit of only $902.16 against F.S. Credit's claim for conversion of its security interest in Kettwig's 1978 crops. On the record before us, we can find no justification for disturbing trial court's resolution of the issue.

 The underlying legal theory is mitigation of damages. In a conversion action, the defendant may show payments made by a third person to the plaintiff with respect to the converted interest. *Keota Produce Co. v. Chicago, Rock Island & Pacific Railway,* 189 Iowa 1284, 1286, 179 N.W. 834, 835 (1920); 18 Am.Jur.2d *Conversion* § 111 (1965). Mitigation of damages is a special defense which must be pled and proved by the defendant, *R.E.T. Corp.,* 329 N.W.2d at 422, or the defendant is limited to circumstances growing out of the plaintiff's testimony. *See Ackerman v. Lauver,* 242 N.W.2d 342, 346 (Iowa 1976); *Iowa Power & Light Co. v. Board of Waterworks,* 281 N.W.2d 827, 833 (Iowa Ct. App.1979); Iowa Code §§ 619.7, .8 (1975).

Here Shear did not plead failure to mitigate as a defense, or that any other sums should be deemed paid in mitigation of this claim. Although F.S. Credit objected when the limited evidence relating to the settlement of the Clarksville Bank litigation was offered, it failed to obtain a ruling from the court and did not raise the question of failure to plead the special defense until its application for further review. We will consider the little evidence offered on this point for whatever weight it may have, while continuing to impose the burden of proof on Shear. *See Ackerman,* 242 N.W.2d at 346.

An examination of the record as it concerns the unrelated litigation discloses that the Iowa State Bank of Clarksville sued these parties, as well as BGFS and others, requesting, along with other relief, that the priority of interests in the 1978 crops be established. Shear, which might have had some voice in the shaping of the final settlement, opted out early by paying into court the money due on the 1978 crops and requesting that it be dismissed from the litigation.

The Clarksville Bank claimed to have loaned Kettwigs money during the period from 1967 through November 6, 1978, secured "by a financing statement recorded with the County Recorder's office on September 5, 1972," and "Renewed with the Secretary of State on July 25, 1977." It further alleged "[t]hat Butler-Grundy County Farm Service Company ... extended credit to Kenneth Kettwig and filed certain financing statements."

The order of court in ˝the Clarksville Bank litigation obviously was not an adjudication; it merely confirmed the settlement made by the parties and protected the clerk of court in distributing the $15,364 held in escrow. We have no way of determining whether the Clarksville Bank, in agreeing to the sum paid F.S. Credit and BGFS, was motivated by the weakness of its own claim or the strength of theirs.[7] It may have feared the legality of "financing statements" to provide a security interest in the 1978 crops, its limited description of the real estate as shown on the financing statements,[8] or the validity of the "renewal" of its alleged security interest through the 1977 filing.

Nor are we satisfied with the evidence relating to the division of the $7432 between BGFS and F.S. Credit. Although F.S. Credit concedes BGFS was paid in full on an open account, we assume business and legal considerations and not charity were the motivating forces. F.S. Credit apparently reimbursed BGFS for Kettwig's

---

**7.** *See Cheshire v. Des Moines City Ry.,* 153 Iowa 88, 91, 133 N.W. 324, 325 (1911) ("The compromise of a suit neither admits the validity of the claim urged, nor ascertains any amount as being due, and amounts to no more than saying, that so much is paid to be rid of the controversy.").

**8.** *See First National Bank v. Francis,* 342 N.W.2d 468, 471 (Iowa 1984).

accounts through the 1977 growing season; the indebtedness later accrued by Kettwig to BGFS must have related to the 1978 crops, the proceeds of which were at stake in the Clarksville Bank action. There was no adjudication that F.S. Credit's claims would prevail. Kettwig's 1977 security agreement and financing statement revealed BGFS as the secured party. There is no indication in the record before us that BGFS ever assigned its security interest to F.S. Credit, a point not raised by Shear in this case.

■ We do not choose to weigh the equities between BGFS and F.S. Credit without the benefit of a record. There is no evidence that F.S. Credit is obtaining more than one satisfaction for its claim against Shear for conversion of its interest in the 1977 crops.[9] The settlement obtained in the unrelated litigation was not paid with respect to the 1977 crops, which are the subject of this conversion action. In these circumstances, we hold trial court correctly charged F.S. Credit with only the $902.16 it actually received from settlement of the Clarksville Bank case. To the extent it modified trial court's judgment in this respect, we vacate the opinion of the court of appeals.

III. *Should the award of presuit interest to F.S. Credit be limited to the legal rate then prevailing?*

Trial court awarded five percent interest pursuant to Iowa Code subsection 535.2(1) (1983) on the $25,000 judgment from January 1, 1978 (one day after the due dates of the notes), until the petition was filed on December 13, 1979. The court fixed the interest from that time at ten percent as provided in Iowa Code section 535.3 (1983). The court of appeals affirmed on this issue and F.S. Credit sought our further review.

F.S. Credit initially cross-appealed from trial court's limitation of the judgment to the principal amount of its secured debt, and from the court's award of interest.

Kettwigs' seven notes, held by F.S. Credit, were dated from February 23, 1977, to September 20, 1977, and totaled $25,000.[10] As shown by our statement of facts, Shear purchased the crops that constituted F.S. Credit's collateral on eight different dates extending from October 11, 1977, to January 9, 1978, with eight checks payable to Kettwig totaling $26,957.14. On appeal F.S. Credit suggests alternate ways in which the alleged error of trial court might be corrected. The first is to compute interest at five percent on $26,957.14 from January 9, 1978 (date of last conversion), until the commencement of the action and thereafter at ten percent, with credits of $902.16 and $750 deducted as of the date of the judgment.

The second method would compute interest at the promissory note rate, nine and one-fourth percent, on each note from its date to the date of commencement of the action, thus obtaining an interest sum of $5,942.38, which, added to the $25,000 principal, would total $30,942.38 for which judgment should be entered less the two credits above mentioned, this sum to draw interest at ten percent from the commencement of the action.

■ The general principles applicable here are easily stated but difficult to apply. "The fundamental principle of damages is to restore the injured party, as nearly as possible, to the position he would have been in had it not been for the wrong of the other party." *Ontario Livestock Commission Co. v. Flynn,* 256 Iowa 116, 128, 126 N.W.2d 362, 369 (1964) (quoting *United States v. Hatahley,* 257 F.2d 920, 923 (10th Cir.1958)). The measure of dam-

---

9. *See Glidden v. German,* 360 N.W.2d 716, 718–19 (Iowa 1984) (A party is entitled to full compensation for injuries suffered, but "there can be only one satisfaction therefor.").

10. The dates and amounts of each note are as follows:

| | |
|---|---:|
| February 23, 1977 | $ 4,552.38 |
| March 23, 1977 | 2,597.38 |
| May 12, 1977 | 3,388.26 |
| June 12, 1977 | 7,978.89 |
| June 22, 1977 | 4,253.14 |
| July 21, 1977 | 2,194.64 |
| September 20, 1977 | 35.31 |
| TOTAL | $25,000.00 |

ages in an action for conversion ordinarily is the "fair and reasonable market value at the time and place of taking." *Id.* at 126, 126 N.W.2d at 368; 18 Am.Jur.2d *Conversion* §§ 82, 83, 86 (1965); 89 C.J.S. *Trover and Conversion* § 164 (1955). Generally, interest is allowed from the date of conversion. *See Hubbard v. State Life Insurance Co.,* 129 Iowa 13, 16, 105 N.W. 332, 333 (1905); *Cutter v. Fanning,* 2 Iowa 580, 590 (1856) ("The value at the time of conversion with interest is the measure of damages...."); *Production Credit Association v. Nowatzski,* 90 Wis.2d 344, 354, 280 N.W.2d 118, 123 (1979).

It is obvious that F.S. Credit's recovery in this case cannot rise higher than the value of its security interest in the collateral, nor can it rise higher than the value of the collateral at the time of its conversion. *See* 89 C.J.S. *Trover & Conversion* § 164 (1955). The security agreement in this case provided the crops would stand as security for the promissory notes "with interest as therein set forth." The seven separate notes each called for interest at an annual percentage rate of nine and one-fourth percent. Obviously F.S. Credit's security interest in these harvested crops would be measured by the principal of the notes and some measure of interest. At the same time, F.S. Credit elected a tort remedy, which would call for only the legal rate of interest, not a contractual rate, from the date of the conversion.

Had the conversion of crops in the sum of $26,957.14 occurred on one date, F.S. Credit's damage would be limited to the lesser of (1) $25,000 plus accumulated interest at nine and one-fourth percent to the date of conversion of the crops with interest thereafter at five percent, or (2) the value of the converted crops on the date of conversion with interest thereafter at five percent.

We are not convinced that justice in this case would require the computation of interest on the declining balance owed on seven notes of different dates, on each of the eight dates of conversion of collateral, extending over a period of almost three months. Such a computation would challenge a sophisticated computer. An examination of the eight conversions discloses that approximately one-half of the total value had been converted with a grain purchase on October 17, 1977. We select this date as a reference point and will assume one conversion at that time. We compute the principal and interest on the notes to be $25,983.28 as of October 17, 1977. Because this is a lesser amount than the total grain sales of $26,957.14, the prior sum represents the value of F.S. Credit's security interest in the crops that were converted and represents its damages at that time. F.S. Credit is entitled to $25,983.28 with interest at five percent from October 17, 1977, to December 13, 1979, the date of filing the petition, and ten percent thereafter. Shear should be credited by the amount of the $902.16 settlement as of March 2, 1982, and by the amount of $750, credited as of October 31, 1983, the date of judgment in this action.[11]

We therefore vacate the court of appeals opinion in the particulars above set forth, and modify the district court judgment as above indicated. This case is remanded to district court for further proceedings in conformance with this opinion. Costs are taxed to Shear.

DECISION OF COURT OF APPEALS VACATED IN PART; DISTRICT COURT JUDGMENT MODIFIED; CASE REMANDED.

---

Pursuant to the terms of the promissory notes, interest is computed from the date of each note.

**11.** Shear did not carry its burden to show a prior date of payment of the $750 settlement received from a different elevator.