In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 14-1561 and 14-1650

IN RE: DAVID L. DUCKWORTH,

*Debtor*,

STATE BANK OF TOULON,

*Plaintiff-Appellee*.

*v.*

CHARLES E. COVEY, Chapter 7 Trustee
for David L. Duckworth,

*Defendant-Appellant*.

---

Appeals from the United States District Court for the
Central District of Illinois.
No. 1:13-cv-01258-JBM—**Joe Billy McDade**, *Judge*.
No. 1:13-cv-01087-JES—**James E. Shadid**, *Judge*.

---

ARGUED SEPTEMBER 9, 2014 — DECIDED NOVEMBER 21, 2014

---

Before FLAUM, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In these appeals we consider whether a secured lender can use parol evidence against a bankruptcy trustee to save a security agreement from a mis-

taken description of the debt to be secured. The security agreement here said that the collateral secured a promissory note made on a given date. The date was a mistake. The borrower had executed a promissory note but two days after the stated date. This is the sort of mistake that can be corrected as between the original parties to the loan by reforming the instrument based on parol evidence.

We have previously held, however, that under Illinois' enactment of the Uniform Commercial Code a secured lender cannot use parol evidence *against a bankruptcy trustee* to correct a mistaken description of the collateral in a security agreement. *In re Martin Grinding & Machine Works, Inc.*, 793 F.2d 592, 595 (7th Cir. 1986). Similarly, the First Circuit has held that a lender cannot use parol evidence against a bankruptcy trustee to change or add to the debts secured by the security agreement, relying on the same provisions in Massachusetts' enactment of the UCC. *Safe Deposit Bank & Trust Co. v. Berman*, 393 F.2d 401, 402–03 (1st Cir. 1968). The reasoning of these cases persuades us that the lender in these appeals was not entitled to use parol evidence against the bankruptcy trustee to correct the mistaken description of the debt to be secured. We therefore hold that the security agreement did not give the lender a security interest in the specified collateral that could be enforced against the trustee. We reverse the judgments of the district courts and remand for further proceedings in the bankruptcy court.

I.   *Factual and Procedural Background*

The parties filed cross-motions for summary judgment based on the following undisputed facts. On December 15, 2008, David L. Duckworth borrowed $1,100,000 from the State Bank of Toulon. The transaction was executed through

a promissory note that was dated and signed on December 15 and an Agricultural Security Agreement dated two days earlier, December 13, 2008. The security agreement said that Duckworth granted the State Bank of Toulon a security interest in crops and farm equipment. The promissory note referred to the security agreement. The security agreement identified the debt to be secured, but the identification had a critical mistake. The security agreement said that it secured a note "in the principal amount of $_____ dated *December 13, 2008*." But there was no promissory note dated December 13. Both the December 15 promissory note and the security agreement were prepared by the bank's loan officer.

In 2010, Duckworth filed a petition for bankruptcy protection under Chapter 7 of the bankruptcy code. Appellant Charles E. Covey was appointed trustee. The bank filed two complaints in bankruptcy court to initiate adversary proceedings. On cross-motions for summary judgment, the bankruptcy court held that the mistaken date in the security interest did not defeat the bank's security interest and that the security agreement of December 13, 2008 secured the note of December 15, 2008. The bankruptcy court issued two decisions in favor of the bank, one for proceeds from the sale of Duckworth's crops and another for proceeds from the sale of some of his farm equipment.  The trustee appealed both bankruptcy court orders to the district court, where the appeals were assigned to different judges. Both district judges affirmed, and the trustee has appealed, in No. 14-1561 regarding the crop sale and in No. 14-1650 regarding the equipment sale. The issue before us is whether the mistaken date in the security agreement defeats the banks' asserted security interest in the crops and farm equipment.

II. *Analysis*

We review *de novo* a grant of summary judgment, meaning we decide the questions of law without giving deference to the decisions of the district court or the bankruptcy court. See *In re ABC-Naco, Inc.*, 483 F.3d 470, 472 (7th Cir. 2007). The trustee argues that the security agreement unambiguously identified the debt to be secured, but did so only for a non-existent debt and therefore failed to grant a security interest to secure the note of December 15, 2008. Even if the mistake in the security agreement might be corrected as between the original parties to the loan, the trustee argues, parol evidence of such a mistake cannot be used against a bankruptcy trustee to save the faulty security agreement.

The bank argues that the security agreement is enforceable against the original borrower and should also be enforceable against the trustee. The bank relies on the terms of the security agreement itself, parol evidence of the original parties' intent, and Illinois' "composite document" rule to save its security interest. The bank also contends that its transaction with the debtor satisfied the minimum requirements for an enforceable security interest under Illinois' enactment of the Uniform Commercial Code and therefore the security interest is effective against the trustee.

We first parse the terms of the security agreement and conclude that it cannot be construed to secure the December 15, 2008 note. We then consider the parol evidence argument. We conclude that although the evidence could have supported reformation of the security agreement as between the original parties, the evidence cannot be used against the

bankruptcy trustee to reform the security agreement or otherwise to correct the mistaken identification of the debt to be secured. Nor does the composite document rule save the bank's security interest here. Finally, we examine the governing statute, Article 9 of the Uniform Commercial Code, and determine that it directs us to enforce the agreement according to its terms, which fail to secure the debt to the bank.

A. *The Terms of the Security Agreement*

The security agreement is governed by Illinois law, except where federal law might preempt it. Illinois adopts the familiar principle that an unambiguous contract is interpreted by the court as a matter of law without use of parol evidence. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999).

The relevant provisions of the security agreement are unambiguous as applied to these facts. The security agreement grants the bank a security interest "to secure the Indebtedness," which is defined as "the indebtedness evidenced by the Note or Related Documents." The security agreement then defines the "Note" as "the Note executed by David L. Duckworth in the principal amount of $_____ dated December 13, 2008, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement." In the security agreement, the dollar amount of the loan was left blank.

The bank faces two textual obstacles in arguing that the terms of the security agreement secure the debt embodied in the December 15 promissory note. First, the security agreement refers clearly to a December 13 promissory note that

the parties agree never existed.[1] The promissory note that the Bank seeks to secure was signed and dated on December 15.

Second, the Bank cannot rely on the security agreement's "Related Documents" provision to incorporate the December 15 promissory note. The relevant definitions in the security agreement are essentially circular. The definition of "Indebtedness" points the reader to "Related Documents," which are defined as documents "executed in connection with the Indebtedness." The "Indebtedness" is defined in turn as the debt evidenced by the "Note or Related Documents," and the Note again is defined as "the Note executed . . . dated December 13, 2008." These circular definitions thus offer no escape from the mistaken date. On its face, the security agreement secures only a December 13 promissory

---

[1] These facts illustrate neatly how latent ambiguity depends on context. For another illustration, see *Frigaliment Importing Co. v. B.N.S. International Sales Corp.*, 190 F. Supp. 116 (S.D.N.Y. 1960) (Friendly, J.), where the parties contracted for the sale of "chicken," which seemed clear on its face. But when the seller shipped stewing chickens instead of young chickens suitable for broiling and frying, the buyer protested and eventually sued. Judge Friendly interpreted the contract's ambiguous language, "chicken," by looking to the parties' negotiations, course of performance, and trade usage. See also, e.g., *Spencer v. Liberty Mutual Ins. Corp.*, 381 F. Supp. 2d 811, 816–21 (S.D. Ind. 2005), where insurance coverage depended on the seemingly clear phrase "using . . . a covered auto." That phrase was ambiguous as applied to a driver who was hurt after he had gotten out of the covered vehicle after an accident to help another person injured in that first accident. In this case, there is no such ambiguity.

note that never existed. The text of the security agreement does not incorporate the promissory note dated December 15 or the description of the debt contained therein.

B. *Parol Evidence Against the Trustee?*

To cure the mistaken date in the security agreement and connect it to the December 15 promissory note, the bank relies primarily on parol evidence, from outside the four corners of the document. The bank relies on the December 15 promissory note itself and testimony regarding the bank's and the borrower's intentions.

The bank offers two related theories for reading the security agreement as securing the December 15 note. First, the bank contends that parol evidence is generally admissible to assist in interpreting the security agreement, which it asserts is ambiguous. Second, the bank argues that we should use the composite document rule to read the security agreement and the December 15 note together because the two documents were executed as part of the same transaction. See, e.g., *Tepfer v. Deerfield Savings & Loan Ass'n*, 454 N.E.2d 676, 679 (Ill. App. 1983) (documents executed by same parties in course of same transaction are "construed with reference to one another because they are, in the eyes of the law, one contract"). Both arguments attempt to justify the use of evidence external to the security agreement itself.[2]

---

[2] It is not at all clear that Illinois courts would apply the composite document rule against the trustee. Illinois courts apply this rule in disputes between the contracting parties: "Accordingly, *as between the same parties*, a note may be affected by a separate writing." *Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 99 (Ill. 1981) (emphasis added). The trustee was not a party to the transaction here. For all the reasons set forth in the text, we

The testimony of both the bank officer who prepared the documents and borrower Duckworth makes clear that the bank made a mistake in preparing the security agreement. We are confident that the bank would have been able to obtain reformation—even of an unambiguous agreement— against the original borrower if he had tried to avoid the security agreement based on the mistaken date. See *Fisher v. State Bank of Annawan*, 643 N.E.2d 811, 814 (Ill. 1994) (reformation action available where clear and convincing evidence shows parties made a mutual mistake); *Suburban Bank of Hoffman-Schaumburg v. Bousis*, 578 N.E.2d 935, 939 (Ill. 1991) (same); *Harley v. Magnolia Petroleum Co.*, 37 N.E.2d 760, 765 (Ill. 1941) (same).

A bankruptcy trustee is in a different position, however. A bankruptcy trustee is tasked with maximizing the recovery of unsecured creditors. See *In re Vic Supply Co.*, 227 F.3d 928, 931 (7th Cir. 2000). To assist in this task, trustees may exercise the so-called strong-arm power: the trustee is deemed to be in the privileged position of a hypothetical subsequent creditor and can avoid any interests that a hypothetical subsequent creditor could avoid "without regard to any knowledge of the trustee or of any creditor." See 11 U.S.C. § 544(a). The strong-arm power is a "blunt information-generating tool" that encourages lenders to give public notice of their security interests by harshly penalizing those who fail to do so. Jonathan C. Lipson, *Secrets and Liens: The End of Notice in Commercial Finance Law*, 21 Emory Bankr. Dev. J. 421, 450-51 (2005) (criticizing the strong-arm power,

---

conclude that the error could not be corrected against the trustee, who was a stranger to the original loan. We have nothing further to add on the composite document rule.

"a necessary evil," as perhaps "more troublesome for its over- and under-inclusiveness than for its basic goals"); see also Barkley Clark & Barbara Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* § 6.02(1)(a) (3d ed. 2011) ("The strong-arm clause is the ultimate Article 9 enforcer."); *id.*, § 6.02(1)(b) ("As a matter of public policy, the [strong-arm] rules penalize secret liens and encourage lenders to give public notice of their security interests.").

The bank argues that constructive notice may still be imputed to a trustee using the strong-arm power. The concept of constructive notice comes from state real property law and defines the property rights of good faith purchasers. See *In re Crane*, 742 F.3d 702, 706–07 (7th Cir. 2013). A good faith purchaser cannot avoid the claims of creditors who have complied with state recording laws that provide public notice of the ownership of and liens on property. For that reason, constructive notice constrains a trustee who seeks to use the specific strong-arm power of a good faith purchaser of property. See 11 U.S.C. § 544(a)(3); *In re Sandy Ridge Oil Co.*, 807 F.2d 1332, 1336 (7th Cir. 1986).

But the trustee here does not need to assume the role of a good faith purchaser to avoid the lender's interest. The trustee can use other strong-arm provisions and stand in the shoes of other subsequent creditors, to which the limitations of constructive notice do not apply. The trustee may avoid the bank's security interest by acting as a hypothetical judicial lien creditor. 11 U.S.C. § 544(a)(1). Such a trustee, unconstrained by constructive notice, may "void a security interest because of defects that need not have misled, or even have been capable of misleading, anyone." *In re Vic Supply Co.*, 227 F.3d at 931.

We therefore must treat the trustee as if he were a hypothetical later lien creditor and ask if the bank has a valid security interest that could be asserted against such a creditor. We conclude that the bank's asserted security interest is not valid against such a later creditor. Such a creditor would be entitled to rely on the text of a security agreement, despite extrinsic evidence that could be used between the original parties to correct the mistaken identification of the debt to be secured.

We find guidance principally from our prior decision in *Martin Grinding* and the First Circuit's decision in *Safe Deposit Bank and Trust Co. v. Berman*. Those decisions emphasize the importance of third parties' ability to rely on unambiguous documents—even if the original parties can show they contain mistakes—to determine the validity and priority of security interests.

In *Martin Grinding*, we held that parol evidence about the original parties' intentions could not be used to correct a mistake in a security agreement by adding, over a bankruptcy trustee's objection, to the agreement's written list of the collateral securing a loan. The lender had failed to list inventory and accounts receivable as collateral in the security agreement. We enforced the unambiguous security agreement according to its terms:

> That the security agreement omits any mention of inventory and accounts receivable is unfortunate for the Bank, but does not make the agreement ambiguous. Since the security agreement is unambiguous on its face, neither the financing statement, nor the other loan documents can expand the Bank's security in-

> terest beyond that stated in the security agreement.

793 F.2d at 595. We recognized that the result was contrary to the intentions of the original parties. We explained, though, that the result should promote economy and certainty in secured transactions more generally, a central goal of Article 9 of the Uniform Commercial Code. *Id*. at 596 (Article 9 was intended to enable "'the immense variety of present-day secured financing transactions … [to] go forward with less cost and with greater certainty.'"), quoting Ill. Rev. Stat. ch. 26, ¶ 9-101 Uniform Commercial Code Comment (comment to version of UCC in effect in 1986).

The rigid rule allows later lenders to rely on the face of an unambiguous security agreement, without having to worry that a prior lender might offer parol evidence (which would ordinarily be unknown to the later lender) to undermine the later lender's security interest. *Martin Grinding*, 793 F.2d at 596–97. On the other hand,

> if parol evidence could enlarge an unambiguous security agreement, then a subsequent creditor could not rely upon the face of an unambiguous security agreement to determine whether the property described in the financing statement, but not the security agreement, is subject to a prior security interest. Instead, it would have to consult the underlying loan documents to attempt to ascertain the property in which the prior secured party had taken a security interest. The examination of additional documents, which the admission of parol evidence would require, would increase the cost

> of, and inject uncertainty as to the scope of pri-
> or security interests, into secured transactions.
> *See California Pump & Manufacturing Co.*, 588
> F.2d [717, 720 (9th Cir. 1978)]; *H & I Pipe & Sup-*
> *ply Co.*, 44 B.R. [949, 951 (Bankr. M.D. Tenn.
> 1984)]. Therefore, although the rule excluding
> parol evidence works results contrary to the
> parties' intentions in particular cases, it reduces
> the cost and uncertainty of secured transac-
> tions generally.

*Id*. at 597 (footnote omitted).

In these appeals, the bank would have us limit *Martin Grinding* to prohibit use of parol evidence to correct mistakes only in identifying *collateral* but to allow its use to correct mistakes in identifying the *debt* to be secured. The bank notes that such identification of collateral is expressly re-quired by the Illinois enactment of the Uniform Commercial Code, see 810 Ill. Comp. Stat. 5/9-203(b)(3)(A), while the statute does not similarly require identification of the debt to be secured.

We reject the bank's suggested limitation, finding persua-sive guidance from our colleagues in the First Circuit in *Safe Deposit Bank and Trust Co. v. Berman*, 393 F.2d 401, which ad-dressed a mistake in identifying the debts to be secured. In that case the borrower took out a series of loans over several years. All the promissory notes referred to the same original security agreement for collateral. The problem was that the original security agreement itself identified only a single promissory note as the debt to be secured. By the time the borrower declared bankruptcy, that single promissory note had been paid off. By the terms of the security agreement

itself, therefore, there was no debt to be secured and thus no security interest.

Like the bank here, the lender argued that the notes showed that the parties intended to create a security interest securing all the later loans. The bankruptcy and district courts had agreed with the trustee, however, that the lender could not use parol evidence against the trustee to show that it had a security interest in the collateral to assure payment of the later loans.

The First Circuit affirmed, albeit "reluctantly because the result is commanded not by fireside equities but by the necessary technicalities inherent in any law governing commercial transactions." 393 F.2d at 402. The First Circuit noted that collateral could be used to secure future debts if the security agreement provided as much. (A so-called "dragnet" clause in a security agreement can include such later loans to the borrower, see UCC § 9-204(c) (security agreement may provide that collateral secures "future advances or other value"), but the intent to secure later loans must be explicit in the security agreement.) The First Circuit held that the absence of such language could not be cured by parol evidence, at least as against the bankruptcy trustee. This was so even if the evidence showed that the original parties had intended to include such language. In other words, parol evidence could not be used to add a dragnet clause where the original security agreement did not include one.

Recognizing that its decision was contrary to the evident intent of the original parties to the loans, the First Circuit concluded that the more general effects of the lender's proposed cure would be worse than sticking to the text of the security agreement:

> In a commercial world dependent upon the necessity to rely upon documents meaning what they say, the explicit recitals on forms, without requiring for their correct interpretation other documents not referred to, would seem to be a dominant consideration. If security agreements which on their face served as collateral for specific loans could be converted into open-ended security arrangements for future liabilities by recitals in subsequent notes, much needless uncertainty would be introduced into modern commercial law.

393 F.2d at 404; accord, *Texas Kenworth Co. v. First Nat'l Bank of Bethany*, 564 P.2d 222, 226 (Okla. 1977) (refusing to interpret security agreement as securing future advances of credit; "potential creditors who do inquire should be able to rely upon the security agreement itself in determining what obligations are secured").

In both *Safe Deposit Bank and Trust* and the case before us, the lender made a mistake and failed to ensure that the security agreement properly identified the debt to be secured. We do not see a sound basis for distinguishing between the mistaken identification of the debt in our case and the mistaken failure to add a "dragnet" clause in *Safe Deposit Bank and Trust*.

The bank points out that even a hypothetical later lender who finds the recorded financing statement has a duty to inquire further to see the security agreement itself. That is certainly correct, as far as it goes. But the bank argues that the later lender would be obliged to inquire still further. We see no basis for imposing on the later lender a legal duty to

inquire beyond the face of an unambiguous security agreement, at the risk of losing the priority of its lien based on parol evidence concerning the dealings between the original parties.

The bank argues, though, that if it had been asked for the security agreement, it surely would have shown the later lender both the security agreement and the promissory note of December 15, despite the erroneous date in the security agreement. That reasoning is not consistent with *Martin Grinding* or *Safe Deposit Bank and Trust*. We also rejected the same argument in *Helms v. Certified Packaging Corp.*, 551 F.3d 675, 680 (7th Cir. 2008), where we reaffirmed that a subsequent creditor is justified in relying on the security agreement alone. In that case, the publicly filed financing statement listed collateral that was not specified in the security agreement itself. We held that the security agreement controlled. A creditor need look no further than the security agreement: "A prudent potential creditor would have requested a copy of the security agreement because that, and not what an employee of an existing creditor might tell the potential creditor over the phone, is the security interest that the parties to the security agreement had agreed to create." *Id*.

That argument applies with even more force where the parol evidence that a party seeks to use to enlarge the security interest consists of a separate and private document (the note of December 15) that is not identified in the security agreement, rather than a publicly available financing statement as in *Helms*. See also *Caterpillar Financial Services Corp. v. Peoples Nat'l Bank, N.A.*, 710 F.3d 691, 696 (7th Cir. 2013)

(explaining that between two conflicting descriptions of the collateral, the "security agreement is controlling").

The bank also argues that we should overlook the erroneous date in the security agreement because it was just a small error that would have been easy to discover. We disagree. We find no limiting principle that would allow the courts or parties to distinguish reliably between small errors and big ones. Under the reasoning of *Martin Grinding*, *Helms*, and *Safe Deposit Bank and Trust*, parol evidence cannot be used to correct even the seemingly minor clerical error in the security agreement. We must hew to the "necessary technicalities inherent in any law governing commercial transactions," even when the result is harsh. *Safe Deposit Bank & Trust Co.*, 393 F.2d at 402. We therefore do not think that parol evidence, contemporaneously executed or not, can be used to undermine the ability of later lenders (or bankruptcy trustees) to rely on unambiguous security agreements.

C. *The Bank's Statutory Argument*

Seeking to steer clear of the parol evidence problem, the bank also contends that it has a security interest enforceable against the trustee because the transaction satisfies the statutory requirements for enforcing a security interest. The bank relies on Illinois' enactment of UCC § 9-203(b), which provides in relevant part, and subject to exceptions that do not apply here:

> [A] security interest is enforceable against a debtor and third parties . . . only if:
>
>> (1) value has been given;
>>
>> (2) the debtor has rights in the collateral … ; and

> (3) … the debtor has authenticated a securi-
> ty agreement that provides a description
> of the collateral … .

810 Ill. Comp. Stat. 5/9-203(b).  (Paragraph (b)(3) offers three alternative ways to satisfy its requirements by giving the secured party possession or control of the collateral, but they do not apply here.) The bank asserts that its security interest is enforceable against the trustee because the bank gave value, borrower Duckworth had rights in the crops and farm equipment, and the parties authenticated a security agreement that described the collateral.

The trustee responds that another provision in the UCC, section 9-201, provides that the terms of a security agreement must be enforced as written: "Except as otherwise provided in the Uniform Commercial Code, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." 810 Ill. Comp. Stat. 5/9-201(a). The trustee argues that the UCC thus points us to the terms of the agreement, and the bank must lose because those terms fail to secure the debt the bank relies upon.

The trustee has the better reading of the UCC. Section 9-203 cannot cure the security agreement's failure to identify correctly Duckworth's debt to the bank, at least against a later lender or the trustee. We have previously read these two sections of the UCC together, concluding that section 9-203's requirements for enforcing a security interest are an exception to section 9-201's general rule that a security agreement is effective according to its terms: "An agreement that violates section 9-203 may not be effective according to its terms." *In re Vic Supply Co.*, 227 F.3d at 932; see also UCC § 9-

201, official comment 2 ("It follows that subsection (a) does not provide that every term or provision contained in a record that contains a security agreement or that is so labeled is effective.").

Section 9-203 sets out minimum requirements that must be satisfied to enforce a security interest. It does not provide a mechanism for rescuing a lender from its mistakes in drafting a security agreement. A security interest that satisfies section 9-203's requirements may be enforced, but only according to the terms of the security agreement. The bank's argument to the contrary is puzzling. It urges that its interest must be "enforceable" under section 9-203. But enforceable how, if not according to the agreement's terms? Section 9-203 provides no gap-filling terms for when a security agreement fails. We see no reason to invent them merely because the bank made a mistake in preparing its security agreement.

\*     \*     \*

Accordingly, we hold that the mistaken identification of the debt to be secured cannot be corrected, against the bankruptcy trustee, by using parol evidence to show the intent of the parties to the original loan. Nor do the other loan documents themselves provide a basis for correcting the error against the trustee. Later creditors and bankruptcy trustees are entitled to treat an unambiguous security agreement as meaning what it says, even if the original parties have made a mistake in expressing their intentions. The judgments of the district courts are REVERSED and the cases are REMANDED for proceedings consistent with this opinion.