**THORP CREDIT, INC., an Iowa Corporation, Plaintiff-Appellant,**

v.

**Eugene A. WUCHTER and Louise M. Wuchter, Defendants-Appellees,**

and

**Eric J. Wuchter, Intervenor-Appellee.**

No. 86–59.

Court of Appeals of Iowa.

July 30, 1987.

Paul Fitzsimmons of Schilling, Ries & Fitzsimmons, Dubuque, and Peter L. Gordon of Whyte & Hirschboeck S.C., Madison, Wis., for plaintiff-appellant.

No appearance for defendants-appellees.

James H. Reynolds, Dubuque, for intervenor-appellee.

Considered by DONIELSON, P.J., and HAYDEN and SACKETT, JJ.

DONIELSON, Presiding Judge.

The plaintiff, Thorp Credit, Inc., appeals the judgment of the district court that the defendants' son, Eric Wuchter, was the owner of certain cows and that those cows were not subject to Thorp's security interest against livestock owned by the defendants, Eugene and Louise Wuchter. Thorp on appeal contends that the trial court erred: (1) in finding that Eric Wuchter was the owner of the disputed cows; (2) in failing to find that the Wuchters were authorized to pledge Eric's cows as collateral for farm obligations allegedly based on the consolidation of the parties' farming operations; and (3) in failing to find that Eric was estopped from asserting ownership of the cows, where Eric allegedly clothed his father with the indicia of ownership, and where Eric's silence regarding his ownership of the disputed cows was allegedly relied upon by Thorp. We affirm.

In 1981 and 1982, the defendants, Eugene and Louise Wuchter, entered into loan agreements with the plaintiff, Thorp Credit, Inc., in which they borrowed $256,000.00 and $12,970.16. A security agreement dated August 26, 1981, granted Thorp a security interest in all the defendants' "livestock, milk cows, open and bred heifers, yearlings ... whether now owned or hereafter acquired."

Following default by the Wuchters in repayment of the loans, Thorp obtained judgment in its favor. In May 1983 Thorp commenced a replevin action to recover all the cows on the Wuchters' farm. In June 1983 the Wuchters filed for bankruptcy. During the period of the bankruptcy, proceedings were stayed on the replevin action. Thorp sought relief from the stay in April 1985. When Thorp was finally ready and able to repossess the cows, the Wuchters' son, Eric, intervened in the action, claiming that he owned some of the cows and that those cows were not subject to Thorp's security interest.

At a hearing held on August 13, 1985, Eric, who was involved in the family farming operation, produced certificates of registry with the Holstein-Friesian Association of America, which listed Eric as the owner of some of the holstein dairy cattle in question. The certificates stated, however: "The ownership of this animal has been transferred on the records of Holstein-Friesian Association of America as follows, but in no event is it to be deemed a guarantee of the legal or equitable ownership of the animal."

The trial court found that Eric was the owner of the disputed cows and that those cows were not subject to the plaintiff's security interest. Thorp's motion for reconsideration was denied on December 10, 1985.

Because the present action is at law, our scope of review is limited to the correction of errors at law. Iowa R.App.P. 4. The trial court's findings of fact in a law action are binding upon us if supported by substantial evidence and justified as a matter of law. Iowa R.App.P. 14(f)(1); *F.S. Credit Corp. v. Shear Elevator, Inc.*, 377 N.W.2d 227, 232 (Iowa 1985). In evaluating the sufficiency of the evidence, we view it in the light most favorable to the judgment and need only consider evidence favorable to the judgment, whether or not it is contradicted. *F.S. Credit Corp.*, 377 N.W.2d at 232. Our review is therefore to determine whether the evidence is adequate to support the findings that trial court is thus deemed to have made. *Bahn-*

*sen v. Rabe*, 276 N.W.2d 413, 414 (Iowa 1979).

We first address Thorp's argument that the trial court erred in finding that Eric Wuchter owned the disputed cattle. Thorp contends that the defendant Eugene Wuchter held all the incidents of ownership in the disputed cows. Thorp argues that Eric's only claim to ownership is based solely on his name being listed on a registration form filed with the Holstein-Friesian Association located in Vermont. We disagree.

"Ownership" is a collection of rights to use and enjoy property, including the rights to sell and transmit it. 63 Am. Jur.2d *Property*, § 31 at 261 (1984). Ownership therefore consists of the possession of things, coupled with an unrestricted right of use, enjoyment, and disposal of such property, *State v. Cowen*, 231 Iowa 1117, 1123, 3 N.W.2d 176, 180 (1942), and is thus entitled to the property's products and profits. The term "owner," however, is of quite general application and is frequently applied to one having an interest in property less than absolute. *City of Cedar Rapids v. Cox*, 250 Iowa 457, 468, 93 N.W.2d 216, 222 (1959). The owner is also one who, in case of destruction of the property, must sustain the loss of it. 63 Am.Jur. *Property*, § 31 at 261 (1984).

A rebuttable presumption of ownership arises from the possession of property. *Thomas Truck & Caster Co. v. Buffalo Caster & Wheel Corp.*, 210 N.W.2d 532, 555 (Iowa 1973). One has possession of personal property when that property is held under that person's dominion and is subject to that person's control. *Burgess v. Leverett and Associates*, 252 Iowa 31, 35, 105 N.W.2d 703, 706 (1960). Possession, however, is only one of the incidents of ownership of personalty, and one may have possession as an agent, or have possession merely as a custodian with consent of the owner. *Johnson v. Marshall*, 232 Iowa 299, 301, 4 N.W.2d 369, 370–71 (1942).

The trial court in its ruling noted that Thorp offered no evidence as to how defendant Eugene Wuchter acquired ownership of the cattle. The trial court found

that Thorp attempted to prove its claim on the weakness of Eric's claim to ownership rather than on its own strength of claim. The trial court found that the certificates of registration relating to the disputed cattle were dated prior to the granting of Thorp's security interest and that they were issued when the cows were very young. The trial court additionally found that while Thorp made periodic checks of the Wuchters' livestock and counted as many as 350 head, Thorp had a security interest in only 224 head. Moreover, the trial court found that Thorp did not identify any of the animals by ear tags or neck chains, nor did Thorp present any evidence as to the milk production records that were kept by Thorp. Finally, the trial court found no inconsistencies in the fact that the milk checks were not separated or that the feed bills for the animals were not segregated. The trial court reasoned that due to the nature of today's family farm operations, allowing children access to the use of feed and housing for livestock is not unusual. Therefore, the trial court held, none of the cows claimed by Eric were subject to Thorp's security interest. We agree.

The record reveals that most of the dairy cows claimed by Eric were registered with the Holstein-Friesian Association well before Thorp was granted a security interest in the defendants' livestock and therefore does not evidence an intent to mask the true ownership of the dairy cows. While the certificates of registration on their face state that the certificates do not guarantee actual ownership, we find that the filing dates indicate that it was the Wuchters' intent at the time of registration that Eric be considered the owner of the registered cows. We also note that all of Eric's livestock was registered, while Eugene Wuchter had not registered any of his cattle since 1972.

■ Upon examination of the record, we also agree with the trial court's conclusion that the farming operation of the Wuchters is not unique in today's farm economy. The record reveals that the money earned from the milk production from Eric's cows was combined with his father Eugene's re-

ceipts. Eric testified that this was done to cover the cost of feed for the cows and the rent on various pastures on which Eric's cows were kept. Any proceeds from the sale of cows or their offspring were placed back into the farm operation in order to cover the cost of Eric's cows' feed and board. In return for helping run the Wuchters' dairy operation, the defendant Eugene Wuchter paid Eric a monthly salary of $500.00.

The record also reveals that Eric's brother, Ed, borrowed money from various lending institutions in order to provide Eric the necessary financing to purchase additional dairy livestock. Eric testified that his father occasionally would purchase a cow for him, but that this sum would be deducted from his wages. Eric testified, however, that he did borrow money one time from the Farm Service Corporation, at which time Eric gave a purchase money security interest in his cows to Farm Service in order to purchase new cows.

■ From these facts, we cannot say that the trial court erred in finding that Eric was the owner of the disputed cows. While the defendant Eugene Wuchter did have possession of the disputed cows on his farm, mere possession of the cows is not the only indicia of ownership. Due to the depressed economic conditions in Iowa agriculture today, it often may become necessary for farm families to pool their resources in order to maintain a profitable farming operation. The arrangement utilized by the Wuchters in the present case is commonly implemented by today's farm families. Though Eugene did receive Eric's portion of the milk receipts, such receipts were not given to Eugene to use as he wished, but were instead used to pay for Eric's share of the feed bill, the rent for various pastures in which Eric's cows were kept, and for various other expenses incidental to the maintenance of the cows claimed by Eric. In exchange for Eric's services on the farm, Eugene paid Eric a salary of $500.00 per month. We simply cannot say that based on the Wuchters' method of farming operations the indicia of

ownership rested with anyone other than with Eric.

Thorp, however, additionally argues that on several occasions representatives of Thorp appeared at the Wuchter farm to take inventory of the livestock and farm equipment, that Eric was present on each occasion, but that Eric did not at any time inform the representatives that he claimed ownership in any of the cows. Thorp argues that if Eric had any actual claim of ownership, Eric would have informed the representatives of his claim, and as a result, Thorp relied on this silence when making their inventory. Thorp therefore argues that Eric's silence indicates that Eugene Wuchter was the actual owner of the cows. We disagree.

Eric testified that on at least one occasion he specifically pointed out to the representatives from Thorp the cows in which he claimed ownership. Eric testified that he pointed out approximately fifteen head of dairy cows, the remaining cows resting in various pastures which Eric rented. Brad Knowler, a representative of Thorp, was also called to testify. Knowler testified that he had no knowledge that any of the cows were registered at the time he visited the Wuchter farm. Knowler additionally testified that no one ever stated to him that any of the cows belonged to Eric. On cross-examination, however, Knowler admitted that an appraisal sheet signed by his companion and bearing Knowler's name indicated that in March 1984 Eric had asserted to Knowler and his representative that he was the owner of some of the dairy cows in question. Knowler also admitted that the commercial loan officer at Thorp would have known about the registration of the disputed cows, but that there was nothing in the record showing any holstein registrations in any of the security agreements signed by the defendants Eugene and Louise Wuchter. Knowler admitted that there were no documents showing that Thorp had obtained security in any registered animals and stated that Thorp had made no claim to any registered animals. It is therefore apparent that Thorp was aware that Eric's registered cows were not covered in the security agreement, and it is also clear that Thorp was informed on at least one occasion that Eric claimed a number of the disputed cows.

■ Thorp also contends that the disputed cows were covered under the security agreement signed by the defendants Eugene and Louise Wuchter. The security agreement signed by Eugene and Louise Wuchter provides that Thorp shall have a security interest in all "farm products ... [including] livestock ... milk cows, open and bred heifers, yearlings ... now owned or hereafter acquired." Thorp argues that this blanket security agreement was sufficient to encompass all of the disputed cows claimed by Eric. Eric, however, argues that the security agreement was too general and did not specifically identify the registered dairy cows, rendering such cows outside the parameters of the security agreement.

Pursuant to Iowa Code section 554.9203 (1985), a security interest is not enforceable against the debtor or a third party with respect to collateral and does not attach unless:

> a. the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and
>
> b. value has been given; and
>
> c. the debtor has rights in the collateral.

*See also F.S. Credit Corp.,* 377 N.W.2d at 231. The test of sufficiency of the description of property listed in a security agreement is that the description must make possible the identification of the thing described. *First State Bank of Nora Springs v. Waychus,* 183 N.W.2d 728, 730 (Iowa 1971). In describing after-acquired property in security agreements, general descriptions must be accepted. *Matter of Sunberg,* 35 B.R. 777, 782 (Bankr.S.D.Iowa 1983), *affirmed* 729 F.2d 561 (8th Cir.1984). Thus, in order for a security interest in any property under the Uniform Commercial

Code, the collateral must be sufficiently described in the security agreement. *Matter of Rogers*, 6 B.R. 472, 475 (Bankr.S.D. Iowa 1980).

In the present case, Brad Knowler testified that someone at Thorp would have known about the registration of holstein cows. Knowler, however, testified that Thorp undertook no specific identification of the nearly 350 head of dairy cows other than as to a broad number. Knowler additionally testified that they did not keep close tabs on the identity of the animals and did not undertake any identification procedures such as ear tag numbers.

While descriptions of collateral need not be painstakingly detailed or accurate, neither should such descriptions be loose or inaccurate. 69 Am.Jur.2d *Secured Transactions*, § 292 at 126–27 (1973). In the present case, there was no description in the security agreement regarding those dairy cows that were registered. Testimony at trial revealed that loan officers at Thorp were aware that holstein dairy cows may be registered. The record also reveals that registered holstein dairy cows bring several hundred dollars more than unregistered cows. Eric testified that all of his registered cows were ear tagged. Brad Knowler testified that no methods of identification were utilized other than to generally count the number of head on the farm. Because the registered cattle were unique from those acknowledged as being owned by Eugene and Louise Wuchter, and because the security agreement contained no reference to these registered cows, we agree with the trial court's conclusion that the disputed cows were not subject to Thorp's security agreement.

■ Thorp, however, additionally points out that Eugene and Louise Wuchter signed a statement indicating that everything on the farm belonged to them. Thorp therefore argues that Eugene and Louise were authorized by Eric to pledge the cows as collateral for the farm operations. Thorp first argues that Eric clothed Eugene with authority to act as his agent and that Eugene had apparent authority to act on Eric's behalf regarding the disputed cows. Thorp argues in the alternative that Eric and Eugene in essence formed a partnership as a result of their combined efforts and that therefore Eugene's signature on the security agreement was binding on Eric.

We first address Thorp's argument that Eugene Wuchter was an agent of Eric and therefore had apparent authority to bind Eric to the security agreement. Though we find no express agreement between Eric and Eugene establishing an agency relationship, an agency relationship may be proven from the parties' words and conduct, from which an intention to create an agency may be implied. *Menzel v. Morse*, 362 N.W.2d 465, 475 (Iowa 1985). A fundamental principle of agency law is that whatever an agent does, within the scope of his actual authority, binds his principal. *Grismore v. Consolidated Products Co.*, 232 Iowa 328, 335, 5 N.W.2d 646, 651 (1942). Actual authority to act is created when a principal intentionally confers authority on the agent either by writing or through other conduct which reasonably interpreted allows the agent to believe he has the power to act. *Dillon v. City of Davenport*, 366 N.W.2d 918, 924 (Iowa 1985). Apparent authority to do acts or make contracts is that which, although not actually granted, has been knowingly permitted by the principal or which he holds the agent out as possessing. *Bauman v. Nutter*, 328 N.W.2d 354, 357 (Iowa App. 1982). Thus, when apparent authority exists, the manifestations of the principal to another party to a transaction must be interpreted in light of what the other party knows or should know instead of what the agent knows or should know. *Curran Hydraulic Corp. v. National-Ben Franklin Ins. Co. of Illinois*, 261 N.W.2d 822, 826–27 (Iowa 1978). But the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority. *Clemens Graf Droste Zu Vischering v. Kading*, 368 N.W.2d 702, 711 (Iowa 1985).

In the present case, Eric testified that he had permitted his father to receive Eric's portion of the milk receipts to pay feed

expenses for the disputed cows and the rent for the various pastures rented by Eric. Eugene at various times also bought and sold registered cows on behalf of Eric. It is therefore apparent that Eric authorized Eugene to pay Eric's bills from the milk receipts and apply any of Eric's proceeds for other expenses incurred in raising the disputed cows. We do not, however, find any evidence that Eric clothed Eugene with any apparent authority to pledge his cows as security for Eugene's debts.

We initially note that Eugene and Louise were not acting on behalf of Eric when they took out the two loans from Thorp, but were acting on their own behalf. The intent is clear from the financing and security agreements that Eugene and Louise were to be solely responsible for the repayment of the loans. Though Eric would undoubtedly benefit from their influx of capital into the family's farm operations, such benefits were incidental to the taking of the loans. Moreover, we find no evidence of any occasion in which Eric authorized Eugene to pledge his cows as a security for any debts accumulated by Eugene. The record reveals that on the one occasion that Eric borrowed money for the purchase of new livestock, it was Eric himself who pledged several of his cows as a security interest. Assuming that some form of agency relationship existed between Eric and Eugene, we do not believe that the granting of permission by Eric for Eugene to receive Eric's milk receipts to apply to Eric's bills regarding the feed and rent translates into authority in Eugene to pledge as security dairy cows which are not owned by him. We thus find no evidence that Eric conferred authority on Eugene to pledge Eric's cattle as security for loans for which Eric was not liable, nor do we believe that Eric's conduct could have created a reasonable belief by Thorp that Eugene had the authority to pledge Eric's cows as security. While Eugene's and Louise's actions may have misled Thorp, we cannot say that Eric's actions resulted in Thorp believing that Eugene and Louise were authorized to pledge Eric's cows.

█ Thorp additionally argues that, assuming the trial court is correct in its characterization of a family farming operation, it is clear that the relationship between Eugene and Eric was a joint venture or partnership. Consequently, Thorp contends that because a partner is authorized to act on behalf of the partnership, Eugene's signature on Thorp's security agreement is binding on the partnership, including Eric. We disagree.

A partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit." Iowa Code § 544.6 (1985). Four elements are necessary to create a partnership: (1) an intent by the parties to associate as partners; (2) a business; (3) earning of profits; and (4) co-ownership of profits, property, and control. *Farmers Grain Co., Inc. v. Irving*, 401 N.W.2d 596, 598–99 (Iowa App. 1986). Under Iowa law, an intention to associate is the crucial test of a partnership. *Chariton Feed and Grain, Inc. v. Harder*, 369 N.W.2d 777, 785 (Iowa 1985). An intention to associate need not be in writing; an intent to associate may be gleaned from the conduct of the parties and the circumstances surrounding the transactions. *Anderson v. Walker*, 256 Iowa 1324, 1328–29, 131 N.W.2d 524, 526–27 (1964).

Upon a thorough examination of the record in the present case, we find that no partnership was created as between Eric and Eugene. The record reveals that both Eric's and Eugene's dairy cows were combined into a single operation. The record also reveals that Eugene was the primary manager of the daily operations of the farm. Eric provided services as a laborer, for which Eugene paid Eric approximately $500.00 per month. The milk proceeds from the cows were commingled, only one milk check being sent to the parties. No attempt was made to determine what feed and milk Eric's cows used and produced as opposed to Eugene's cows.

The record also reveals, however, that Eugene would deduct from Eric's wages the price of a new head of livestock which he purchased on Eric's behalf. Eric testi-

fied that his father considered him an employee of the farm. No partnership tax returns were filed; rather, Eugene claimed the proceeds from the dairy operations as income on his personal tax returns. There is no evidence in the record that Eric was held out as co-owner of the assets of the farm or in fact had any interest in the operation other than in his own dairy cows. Concerning the buying and selling of the operation's dairy cows, there is no evidence in the record to support a finding that Eric had any authority to buy or sell any cows other than those which he personally bought or sold. The record reveals that there was no attempt to divide the profits from the milk receipts equally between Eric and Eugene; all proceeds were given to Eugene. The record does not reveal that a joint bank account was opened whereby both Eric and Eugene would be authorized to pay expenses and deposit receipts.

From these facts we conclude that no partnership existed as between Eric and Eugene. Even assuming, *arguendo*, that Eric and Eugene had a joint interest in the dairy cattle, such a fact does not of itself establish that a partnership existed. Iowa Code § 544.7(2). Additionally, the sharing of gross returns does not of itself establish a partnership whether or not the persons sharing them have a joint or common right or interest in any property from which the returns were derived. Iowa Code section 544.7(3). While the receipt by a person of the share of the profits of a business is prima-facie evidence that the person is a partner in the business, no such inference may be drawn if such profits were received in payment as wages of an employee. Iowa Code section 544.7(4)(b). In the present case Eric received $500.00 per month in wages as an employee. We thus find no evidence of a partnership and therefore hold that the disputed dairy cows were owned by Eric and that as such they were not subject to Thorp's security agreement.

Thorp lastly argues that even if the trial court was correct in concluding that Eric was the owner of the disputed cows, Eric should be estopped from denying the validity of Thorp's security interest based on Eric's alleged silence regarding ownership. Based upon the above discussion and examination of the various other arguments raised by Thorp, we find no merit in this argument.

AFFIRMED.

HAYDEN, J., concurs.

SACKETT, J., specially concurs.